```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

STANLEY DOOLEY,                      )
                                     )
        Plaintiff,                   )
                                     )
  v.                                 )      No. 4:08 CV 870 DDN
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Stanley Dooley for disability insurance benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. and §§ 1381 et seq., respectively.[1] (Tr. 569-70.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(c). For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

## I. BACKGROUND

On April 16, 2004, plaintiff filed an application for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income under Titles II and XVI of the Social Security Act, alleging disability since November 15, 1999, later amended to May 14, 2002. (Tr. 14, 270-272, 377, 569-570.) He alleged disability due to hypertension,

---

[1] Plaintiff filed applications in 1999 (Tr. 46-48, 242A-42C), which were denied initially. (Tr. 29, 33-37, 242D-42H.) He amended his applications seeking a closed period of disability. (Tr. 93-94.) On May 18, 2001, an ALJ found that plaintiff was disabled from September 15, 1999 through September 26, 2000. (Tr. 243-51.) Plaintiff filed new applications on January 7, 2002 (Tr. 558-61), which were denied initially on April 11, 2002 and were not further pursued. (Tr. 252, 255-59, 562-67.) Because plaintiff now alleges disability as of May 14, 2002, there is no issue regarding reopening any prior decision.

congestive heart failure (CHF), and cardiomyopathy.[2]  (Tr. 318.)
Plaintiff's claims were denied initially and he requested a hearing,
appealing directly to an ALJ.[3]  (Tr. 253-54, 260-65, 571-77.)

On May 5, 2006, following a hearing, an ALJ found that plaintiff
was not disabled as defined under the Act.  (Tr. 11-21.)  On April 15,
2008, the Appeals Council denied his request for review.  (Tr. 6-8.)
Thus, the ALJ's decision stands as the final decision of the
Commissioner.

## II. MEDICAL AND OTHER HISTORY

Plaintiff was born in 1952.  He has a high school education and has
received training in carpentry, electronics, and cable installation.
(Tr. 324, 588.)  He has worked as a maintenance person, cable installer,
and school janitor.  (Tr. 15, 319, 316-29, 336-39.)

On November 19, 2001, an Echocardiographic and Doppler[4] Report by
Bharat Shah, M.D. at DePaul Health Center showed that plaintiff suffered
from left atrium enlargement, concentric hypertrophy[5] of the left
ventricle and left ventricular enlargement and moderate to severe
reduction of LV ejection fraction[6] between 35 to 40%, moderate aortic

---

[2] Disease of the myocardium.  Stedman's Medical Dictionary 313 (28th ed. 2006).

[3] Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case.  20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466 (2007). These modifications include, among other things, the elimination of the reconsideration step.  See id.

[4] An ultrasound instrument of diagnostic value in peripheral vascular and cardiac disease.  Stedman's at 580.

[5] General increase in the bulk of a part or organ, not due to tumor formation.  Stedman's at 929.

[6] The amount of blood pumped out of a ventricle during each heartbeat. The ejection fraction evaluates how well the heart is pumping.  WebMD, http://www.webmd.com/heart-disease (last visited September 11, 2009).

insufficiency, moderate tricuspid insufficiency, moderate pulmonary hypertension, and mild mitral insufficiency. (Tr. 461.)

On December 18, 2001, plaintiff was seen by Glenn Fox, M.D. (Tr. 465.) Plaintiff was experiencing dyspnea[7] on exertion and hypersomnolence.[8] (Id.) Plaintiff reported compliance with his medications, which was confirmed by his wife who was also present. Dr. Fox's assessment was cardiomyopathy, most likely on the basis of hypertension. Dr. Fox noted that plaintiff's past cocaine and alcohol use had contributed to his cardiomyopathy. (Id.)

On May 14, 2002, plaintiff was seen again by Dr. Fox. (Tr. 466.) Plaintiff was experiencing upper abdominal bloating, similar to what he had experienced previously in connection with congestive heart failure due to dilated cardiomyopathy. (Id.) He was noted to have chronic, stable dyspnea on exertion. (Id.) He reported he was compliant with his medication. He was continuing to drink to excess, but stated he had reduced his cocaine use, stating he "hardly does it at all." (Id.)

On November 9, 2002, Dr. Fox's assessment included hypertension (HTN), poor control; depression; alcoholism; and hypersomnolence. (Tr. 467.) On December 1, 2003, Dr. Fox noted that plaintiff had recently been seen in an emergency room for uncontrolled blood pressure. (Tr. 469.)

On December 3, 2003, Joseph H. Bodet, M.D., administered an echocardiogram[9] to plaintiff at St. Mary's Health Center (St. Mary's). (Tr. 472-73.) His impressions included, among other things, left ventricular enlargement, moderate to moderately severe; left ventricular dysfunction, moderate to moderately severe; left atrial enlargement,

---

[7]Shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs. It occurs normally during intense physical exertion or at high altitude. Stedmans at 601.

[8]Somnolence is an inclination to sleep. Stedman's at 1789.

[9]The record obtained by echocardiography (the use of ultrasound in the investigation of the heart and great vessels and diagnosis of cardiovascular lesions). Stedman's at 608.

-3-

moderate; fibrocalcific[10] change of the aortic valve with mild aortic stenosis; papillary muscle dysfunction; diastolic dysfunction; and aortic insufficiency, moderate. (Id.)

From December 4-11, 2003, plaintiff was hospitalized at St. Mary's for increased leg swelling and shortness of breath. (Tr. 475-504.) A cardiac catheterization showed 80-90% blockage of the first diagonal branch of the left anterior descending artery, for which an angioplasty stent was placed. Plaintiff's discharge diagnoses included congestive heart failure; cardiovascular diseases (following stent placement); uncontrolled hypertension; cocaine drug abuse; and possible chronic obstructive pulmonary disease. (Tr. 476.)

On December 15, 2003, Dr. Fox saw plaintiff for follow-up on his angioplasty.[11] (Tr. 470.) His assessment included hypertension, good control, and lower extremity edema, possibly due to a medication. (Id.)

On August 31, 2004, Saul Silvermintz, M.D., performed a consultative examination of plaintiff for Disability Determination Services. (Tr. 509-514.) His impression was hypertension with evidence of end organ damage, and history of chronic heart failure with dilated cardiomyopathy. (Tr. 511.)

From November 1, 2004 through December 22, 2005, plaintiff was treated by Khaled Hassan, M.D., and Francois Charles, M.D., medical partners. (Tr. 524-39.) On November 1, 2004, Dr. Hassan's diagnoses included, among other things, uncontrolled HTN, coronary artery disease (CAD), and congestive heart failure (CHF). (Tr. 525.) On March 15, 2005, Dr. Charles diagnosed cardiomyopathy. (Tr. 528-29.) On December 22, 2005, plaintiff was noted to be suffering from fatigue. (Tr. 539.)

On June 8, 2005, Richard B. Whiting, M.D., performed another echocardiogram at St. Mary's. (Tr. 541-42.) His findings included

---

[10]Pertaining to sharply defined linear and nodular opacities containing calcifications, seen on a chest radiograph image, usually a residual by-product from earlier granulomatous disease. Stedman's at 723.

[11]Reconstitution or recanalization of a blood vessel. Stedman's at 88.

-4-

significant concentric[12] left ventricular hypertrophy; biatrial enlargement; mild mitral[13] insufficiency; mild tricuspid insufficiency; mild aortic stenosis; and moderate aortic insufficiency. (Tr. 542.)

On February 14, 2006, Francois Charles, M.D., completed a Physical Medical Source Statement. (Tr. 547-50.) Dr. Charles's diagnoses included hypertensive cardiovascular disease (HCVD), congestive heart failure, and dilated cardiomyopathy. (Tr. 547.) Dr. Charles stated that in an 8-hour workday, plaintiff could sit for 30 minutes, stand for 30 minutes, and walk for 30 minutes, but could not do any lifting or carrying. (Tr. 547-48.) He also stated that plaintiff was limited in balancing even on level terrain, could not reach above his head or stoop, could not tolerate exposure to odors, dust, or noise, and had a medically determinable impairment that could be expected to produce flank pain. (Tr. 549.) Dr. Charles gave an onset date of November 1, 2004, and added that plaintiff's impairments would cause him to need to lie down to take a nap during an 8-hour workday. (Tr. 550.)

On March 31, 2006, plaintiff underwent an upper endoscopy at St. Mary's performed by Joel Y. Riley, M.D. Dr. Riley's impressions included gastric erosion and hiatal hernia. (Tr. 555.)

An unsigned, undated Physical Residual Functional Capacity Assessment (PRFCA) form is included in the record. (Tr. 515-21.) It is immediately followed by a signed narrative by physician W. Bruce Donnelly, M.D. dated August 2, 2004. (Tr. 523.) The PFRCA form states that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday, with no other limitations. (Tr. 515-21.)

In a Disability Report – Adult form apparently completed by a staff member at the Social Security office, plaintiff reported that the conditions that limited his ability to work included high blood pressure, congestive heart failure, and cardiomyopathy. (Tr. 318.) He

---

[12]Having a common center, such as two or or more spheres, circles or segments of circles that are within one another. Stedman's at 425.

[13]Relating to the mitral or bicuspid valve. Stedman's at 1216.

said that he was short of breath, and suffered from pain in the chest and tiredness. (Tr. 319.) He listed previous jobs as building maintenance, factory/assembly, janitorial, and TV installation. (Tr. 319-320.) He said that he completed the 12th grade and in 1979 had completed cable TV training. (Tr. 324.)

In a Work History Report form apparently completed by a staff person at the Social Security office, and in a June 1, 2004 Work History Report form completed by plaintiff, plaintiff described his past employment. (Tr. 326-35, 336-43.)

In an untitled form dated June 1, 2004, plaintiff stated that he was not currently working, that his heart condition kept him from working, that he was "tired all the time," and that he suffered from shortness of breath. (Tr. 344, 348.) He said that any physical activities made his symptoms worse. (Id.) He reported that the side effects from his medications made him drowsy, sleepy, and tired. (Id.) He stated that he lived at home, with family or friends, or wherever he could. (Tr. 345.) He reported that he was not able to perform household chores or activities. (Tr. 346.) He said that he no longer cooked, that he slept all the time, that it took him a long time to groom himself, that he could not watch a 30-minute TV show without falling asleep, and that he could not drive because he might fall asleep. (Tr. 347.)

In a Disability Report – Field form dated May 6, 2004, interviewer C. Pufalt noted that plaintiff's voice was weak, and that he seemed congested and a bit short of breath, but that he was cooperative and attempted to answer all questions. (Tr. 316-17.)

Michelle Kirksey, plaintiff's stepdaughter, completed a Function Report Adult – Third Party form on August 27, 2004. (Tr. 349-357.) She reported that she had known plaintiff for 31 years, and that he sometimes stayed at her house. (Tr. 349.) She reported that plaintiff stayed with various family members; that he formerly worked, drove, did chores, visited, and traveled, but that he now slept all the time; that he needed special reminders to take medicine, and to take care of personal needs and grooming; and that he could not do anything physical. (Tr. 350-53.) She reported that he could not lift or walk without

getting out of breath, and that he would "fall asleep on you." (Tr. 354.) She stated that he no longer handled stress well and acted like he no longer cared about anything. (Tr. 355.)

**Testimony at the Hearing**

Plaintiff appeared and testified at a hearing held on April 26, 2006. (Tr. 582-601.) Plaintiff testified that he was living in the upstairs of a two-family flat, the downstairs of which was occupied by his son and his son's family. (Tr. 586.) He testified that he had no income, although he was receiving food stamps, as well as assistance from family members. (Tr. 587.) He testified that he had completed high school, and had training in cable, electronics, and carpentry. (Tr. 588.)

Plaintiff testified that he could not work because of problems with standing, walking, lifting, and climbing stairs. (Tr. 592-93.) He testified that he had tingling in his fingers, numbness in his lower legs and knees, and became very short of breath. (Tr. 593.) He testified that he could probably sit for a half an hour before needing to lie down; stand about an hour; and walk about a block and a half before needing to stop to catch his breath. (Id.) He testified that going up and down steps made his legs weak and made him be totally out of breath. (Tr. 593-94.) He testified that he tried not to lift any weight, and that he could lift five to ten pounds. (Tr. 594.) He testified that his numbness, dizziness, and fatigue were more significant than his pain. (Id.) He added that his medicines caused drowsiness. (Tr. 594-95.)

Plaintiff testified that he napped three or four times a day, and described his energy level as low. (Tr. 595.) He testified that his adult son performed most of his household chores for him. (Tr. 595-97.) He testified that he probably drank a six-pack a week, had not used street drugs for possibly three years, specifically not since his heart surgery in December 2003. (Tr. 598-99.) He testified that he smoked about ten cigarettes per week. (Tr. 599.)

### III. DECISION OF THE ALJ

At Step One, the ALJ determined that plaintiff had not engaged in substantial gainful activity since May 14, 2002. (Tr. 20.) At Step Two, the ALJ found that plaintiff had status-post right coronary artery disease with stent placement, hypertension controlled by medication, left ventricular hypertrophy, a history of congestive heart failure and cardiomyopathy, recent onset gastric erosion and hiatal hernia, and a history of alcohol and cocaine use. (Id.)

At Step Three, the ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing on the Commissioner's list of disabling impairments. (Id.) The ALJ found that the allegations by plaintiff and his stepdaughter that his limitations precluded all sustained work activity were not totally credible for the reasons set out in the body of his decision (Tr. 20). The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform the physical exertional and nonexertional requirements of work except for lifting or carrying more than 10 pounds frequently or more than 20 pounds occasionally. He determined that plaintiff was unable to perform any of his past relevant work. (Tr. 20.)

At Step Four, the ALJ found that plaintiff had the RFC for a full range of at least light work. (Id.) The ALJ noted that State Agency medical evaluators had established that plaintiff could perform a full range of light work, citing Exhibit B14F, the aforementioned PRFCA form. (Tr. 18, 515-23.)

At Step Five the ALJ found that plaintiff was not disabled, citing the "Grids," to take administrative notice that there was work in the national economy that plaintiff could perform. 20 C.F.R. §§ 404.1569, 416.969, and Rules 202.13-202.15. (Tr. 21.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is

enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, as in this case, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) assuming without justification that the PRFCA form was completed by a physician; (2) in

-9-

giving little weight to the opinion of Dr. Francois Charles; and (3) in failing to call a medical expert.

**A.   The Physical Residual Functional Capacity Assessment Form**

The ALJ found that plaintiff had the residual functional capacity (RFC) for a full range of light work. (Tr. 20.) In supporting his conclusion, the ALJ stated that he found "no persuasive reason why the claimant could not perform a full range of light work, as established by State Agency medical evaluators in Exhibit B14F." (Tr. 18.)

Exhibit B14F is the undated, unsigned PRFCA form. (Tr. 515-522.) Plaintiff argues, relying exclusively on Dewey v. Astrue, 509 F.3d 447 (8th Cir. 2007), that because it is unclear who authored the form or when it was completed, the ALJ's assumption that it was completed by a medical evaluator is unsupported by the record.

The Administration argues that the PRFCA was authored by physician W. Bruce Donnelly, M.D. It argues that, although the last page of the PRFCA is unsigned and undated, it is followed, "as is the usual case," by a dated and signed narrative statement by Dr. Donnelly. The Administration cites an identical form in the record, completed on April 8, 2002, just prior to plaintiff's amended alleged onset date, by Robert Taxman, M.D., which is also followed by a narrative report that is consistent with Dr. Donnelly's assessment. (Tr. 445-54.)

In Dewey v. Astrue, 509 F.3d 447, 448 (8th Cir. 2007), the assessment form was completed and signed by a non-medical counselor. The Eighth Circuit reversed and remanded an adverse disability determination because the ALJ mistakenly relied on a lay source's RFC assessment as medical testimony. The court stated that it could not say that the ALJ would inevitably have reached the same result if he had understood the RFC assessment had not been completed by a medical source.

In this case, however, the ALJ did not make a similar mistake. Here, the ALJ's assumption that the PRFCA form was completed by a physician was reasonable because Dr. Donnelly, a physician, signed and dated the narrative report immediately following the form. (Tr. 523.) This court concludes this is not a situation akin to Dewey in which the

assessment was completed and signed by a non-medical counselor. Further, there is no contrary medical opinion addressing the period relevant to plaintiff's Title II application. This court therefore concludes the ALJ was not in error.

**B.   Dr. Francois Charles**

Plaintiff next argues the ALJ erred in giving little weight to the opinion of Dr. Francois Charles as a treating physician. The Administration argues the ALJ properly weighed the medical opinion evidence. This court agrees.

On February 14, 2006, Dr. Francois Charles, a partner of Dr. Hassan's, completed a Physical Medical Source Statement. (Tr. 547-550.) Dr. Charles gave diagnoses of hypertensive cardiovascular disease, congestive heart failure, and dilated cardiomyopathy. (Ex. B. 18-F). He stated that plaintiff could sit, stand, and walk for 30 minutes each without a break during an 8-hour workday; that he could not be expected to lift or carry 5 pounds on even an occasional basis; and that he would need to lie down or take a nap during an 8-hour workday. Dr. Charles gave an onset date of November 1, 2004. Dr. Charles opined that plaintiff could not lift as much as five pounds, should never reach above his head or stoop, and was limited in balancing. (Tr. 549.) Dr. Charles indicated that plaintiff had a medically determinable impairment that could cause pain and listed plaintiff's subjective indications of pain as complaints of pain and fatigue. (Tr. 549.) Dr. Charles also noted that plaintiff had an impairment that would cause him to need to lie down or take a nap during a normal eight-hour workday, and that these limitations had an onset date of November 1, 2004. (Tr. 550.) Dr. Charles did not make a retroactive assessment to Plaintiff's amended alleged onset date of May 14, 2002.

The ALJ gave little weight to Dr. Charles's opinion, citing two reasons. First, he noted Dr. Charles's partner, Dr. Hassan, had treated plaintiff on many more occasions than had Dr. Charles, and was therefore "more worthy of the title of 'treating physician' in this case." (Tr. 18.) He noted that Dr. Hassan had never stated or implied that plaintiff was disabled, nor had Dr. Silvermintz or others.

Second, the ALJ noted Dr. Charles's opinion was at odds with his own treatment records of plaintiff, as well as those of Drs. Silvermintz and others, which showed few if any complaints of chest pain, shortness of breath or fatigue. (Tr. 18.) The ALJ also questioned Dr. Charles's credibility due to the nature of the form questionnaire which he believed included a number of leading questions and inducements.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the opinion should be given controlling weight. Id. A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight. See id.; Sampson v. Apfel, 165 F.3d 616, 618 (8th Cir. 1999). Thus, if other medical assessments are supported by superior medical evidence, the ALJ may discount the opinion of the treating physician. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). However, the ALJ may not discredit a claimant solely because her subjective complaints are not fully supported by objective medical evidence. Ramirez v. Barnhart, 292 F.3d 576, 580-82 (8th Cir. 2002).

"Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. §§ 404.1527(d)(2)(I), 416.927(d)(2)(I) (2007). The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians. Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991).

The ALJ may discredit the opinion of a treating source when it is conclusory, or inconsistent with his or her own notes, or inconsistent with other substantial evidence in the record, all of which would apply in this case. See Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir.

-12-

2006). Records from November 1, 2004 through December 22, 2005 show Dr. Charles saw plaintiff only once, on May 15, 2005, during the plaintiff's eight visits. (Tr. 524-39.) Because Dr. Charles treated plaintiff only once, this court concludes it was reasonable for the ALJ not to give his opinion controlling or substantial weight.

The ALJ's decision describes inconsistencies with Dr. Charles's opinion and the record as a whole. (Tr. 18-19.) Following review of the record, the court also finds that the opinion of Dr. Charles in the PRFCA form is inconsistent with his own treatment notes and the record as a whole. The court further finds that there is substantial evidence in the record as a whole which supports the ALJ's determination to give little weight to the opinion of Dr. Charles because his conclusions as to plaintiff's limitations are not supported by objective medical evidence or medically acceptable clinical and laboratory diagnostic techniques. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability."); see also Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (a treating physician's opinion is afforded significant weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques."). Accordingly, the court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole.

Plaintiff also complains the ALJ did not address whether Dr. Charles's opinions were supported by the records of Dr. Fox and St. Mary's, which he argues lend support to Dr. Charles's opinion. This court disagrees.

The ALJ noted that when plaintiff saw Dr. Fox on December 18, 2001, Dr. Fox stated that his diminished ejection fraction was probably due to noncompliance with his hypertension medication. (Tr. 16.) He further noted that when plaintiff saw Dr. Fox on May 14, 2002, he reported compliance with medication, but dietary noncompliance. Plaintiff reported that he drank a 12-pack per day over the course of a weekend, that he has not eliminated cocaine, but that he "hardly does it at all." His diagnoses were hypertension, poor control, with hypertensive cardiomyopathy, and alcohol and cocaine abuse. (Id.) Plaintiff saw Dr.

-13-

Fox again on November 9, 2002. His diagnoses were hypertension with poor control, depression, alcoholism, and hypersomnolence. (Tr. 467.)

On December 1, 2003, Dr. Fox noted that plaintiff had been noncompliant with lifestyle recommendations and came in when he had problems. Plaintiff continued to drink and to use cocaine. He reported that plaintiff had been compliant with his medications and he had no chest pain. His assessments were accelerated hypertension, cardiomyopathy, and alcohol and cocaine abuse. Dr. Fox adjusted his medications and ordered an echocardiogram (Tr. 469) which was followed by his subsequent December 2003 hospitalization at St. Mary's for stent placement.

In his decision the ALJ noted Dr. Fox never said or implied that plaintiff was disabled or seriously incapacitated at any time after September 2000. He noted his blood pressure was always well controlled after December 2003, and he seldom if ever complained of chest pain, shortness of breath, dizziness or fatigue after that, nor were there subsequent signs of congestive heart failure. (Tr. 18.) Based on the above, the court concludes the ALJ properly reviewed Dr. Fox's and St. Mary's records.

**C.   Medical Expert/Consultative Medical Examination**

Plaintiff argues the ALJ erred in failing to call a medical expert to refute the opinion of Dr. Charles. This court disagrees.

The ALJ should develop a reasonably complete record. See 20 C.F.R. §§ 404.1544; §§ 416.1544 (2008). The ALJ is required to order a consultative medical examination only when the evidence as a whole is not sufficient to support a decision on a claim. See id. at §§ 404.1519(a)-404.1519(b); 416.1519(a)-416.1519(b). In addition, the ALJ may ask for and consider the opinion of a medical advisor on the nature and severity of plaintiff's impairment and whether the impairment equals the requirements of any listed impairment. See id. at §§ 404.1527(f)(2); 416.1527(f)(2). Case law and regulations indicate that the ALJ has discretion over the ordering of additional tests, and such tests are only required if necessary to make an informed disability decision. See id. at §§ 404.1519(a); 416.1519(a) Barrett v. Shalala, 38 F.3d 1019, 1023

(8th Cir. 1994). "[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)).

Here, the ALJ's findings and conclusions are sufficiently supported by the medical evidence in the record without the need for additional medical evidence. The ALJ's decision points directly to the medical evidence and the opinions of Drs. Hassan and Silvermintz, the physicians at St. Mary's, and others on which the ALJ based his analysis. Additional medical evidence was not required in this case because the evidence as a whole is sufficient to support the ALJ's decision. The ALJ in this case adequately developed the record.

## VI. CONCLUSION

For the reasons set forth above, the court finds that the decision of the ALJ is supported by substantial evidence on the record and is consistent with the Regulations and applicable law. The decision of the Commissioner of Social Security is affirmed. An appropriate judgment order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 28, 2009.